Slip Op. 19-103

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, AND TATE & LYLE AMERICAS LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant. | Before: Mark A. Barnett, Judge<br>Court No. 18-00160 |

## OPINION

[Sustaining the U.S. Department of Commerce's final negative determination.]

Dated: August 2, 2019

Patrick J. Togni and Stephen A. Jones, King & Spalding LLP, of Washington, DC, for Plaintiffs.

Meen Geu Oh, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Mykhaylo A. Gryzlov, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

      Barnett, Judge: Plaintiffs, Archer Daniels Midland Company, Cargill, Incorporated, and Tate & Lyle Americas LLC (collectively, "Archer Daniels") move, pursuant to U.S. Court of International Trade Rule 56.2, for judgment on the agency record, challenging the U.S. Department of Commerce's ("Commerce" or "the agency") final negative determination in the countervailing duty ("CVD") investigation of citric acid and certain citrate salts from Thailand.  See Mot. for J. on the Agency R., ECF No. 19;

*Citric Acid and Certain Citrate Salts From Thailand*, 83 Fed. Reg. 26,004 (Dep't Commerce June 5, 2018) (final negative countervailing duty determination, and final negative critical circumstances determination) ("*Final Determination*"), ECF No. 15-1, and accompanying Issues and Decision Mem., C-549-834 (May 29, 2018) ("I&D Mem."), ECF No. 15-2.[1]

      Archer Daniels' dispute stems from the importation of select equipment and machinery ("the machinery") from the People's Republic of China ("China") into Thailand by COFCO Biochemical (Thailand) Co., Ltd. ("COFCO"); Niran (Thailand) Co., Ltd. ("Niran"); and Sunshine Biotech International Co., Ltd. ("Sunshine") (collectively, "Respondents").  Respondents imported the machinery duty-free pursuant to Section 28 of Thailand's Investment Promotion Act ("IPA Section 28"), a subsidy program exempting certain imported machinery from payment of import duties when used in specified projects.  *See* I&D Mem. at 8-12.  Commerce determined, however, that duty-free importation of the machinery from China pursuant to IPA Section 28 conferred no benefit because, absent IPA Section 28 eligibility, the duty rate on the machinery imports would have been zero pursuant to the "ASEAN-China FTA."[2]  I&D Mem. at 11, 18.

---

[1] The administrative record for this case is divided into a Public Administrative Record ("PR"), ECF No. 15-3, and a Confidential Administrative Record ("CR"), ECF No. 15-4. Parties submitted joint appendices containing record documents cited in their briefs. *See* Public J.A. ("PJA"), ECF No. 28; Confidential J.A. ("CJA"), ECF No. 27.  The court references the confidential versions of the relevant record documents, unless otherwise specified.

[2] "ASEAN-China FTA" stands for "Association of Southeast Asian Nations (ASEAN)-China Free Trade Area (FTA)."  I&D Mem. at 2.

Archer Daniels contends that Commerce's determination is unsupported by substantial evidence and is otherwise not in accordance with law because the record shows that Respondents did not import the machinery pursuant to the ASEAN-China FTA and could not have complied with its requirements.  *See* Pls.' Rule 56.2 Br. in Supp. of Mot. for J. on the Agency R. ("Pls.' Br.") at 1-2, ECF No. 31.  Defendant, United States ("the Government"), contends that Commerce's determination is supported by substantial evidence and is otherwise in accordance with law because the record is "replete" with documents demonstrating that Respondents' machinery "originated from China."  *See* Def.'s Corrected Resp. to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. ("Def.'s Resp.") at 5, ECF No. 34.  For the reasons discussed herein, Archer Daniels' motion is denied.

## BACKGROUND

### I.    Legal Framework

In order to offset the unfair competitive advantages created by foreign subsidies, "Commerce is required to impose countervailing duties on merchandise that is produced with the benefit of government subsidies" when it causes material injury to a domestic industry.  *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed. Cir. 2014); *see also Zenith Radio Corp. v. United States*, 437 U.S. 443, 455-56 (1978) (discussing the purpose of CVD law); 19 U.S.C. § 1671(a).  "Such a subsidy exists when (1) a foreign government provides a financial contribution (2) to a specific industry and (3) a recipient within the industry receives a benefit as a result of that contribution."  *Fine Furniture (Shanghai)*, 748 F.3d at 1369 (citing 19 U.S.C. § 1677(5)(B)).  In other

words, to constitute a countervailable subsidy, a foreign government must provide "a specific financial contribution to a party and that party [must] benefit[] from the contribution." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1272 (Fed. Cir. 2012) (citing 19 U.S.C. § 1677(5)).

A party benefits from the contribution when "taxes or import charges paid by a firm as a result of the program are less than the taxes the firm would have paid in the absence of the program." 19 C.F.R. § 351.510(a)(1). Thus, in order to measure the value of the financial contribution, Commerce must calculate the taxes the firm would have paid absent the countervailable program. *See Royal Thai Gov't v. United States*, 32 CIT 97, 100, 534 F. Supp. 2d 1373, 1377 (2008) ("*Royal Thai V*"), aff'd sub nom. *Royal Thai Gov't v. U.S. Steel Corp.*, 312 F. App'x 342 (Fed. Cir. 2009). In furtherance of this inquiry, "Commerce must establish a benefit calculation benchmark, or more precisely, determine what tariff rate would have applied absent the alleged subsidy. Once this benchmark is established, Commerce will have a reference point from which it can determine the amount of benefit that has been conferred." *Id.* It is Commerce's selection of a benchmark that is at issue here.

## II. Factual and Procedural History

On June 22, 2017, Commerce initiated a countervailing duty investigation into citric acid and certain citric salts from Thailand. *See Citric Acid and Certain Citrate Salts From Thailand*, 82 Fed. Reg. 29,836 (Dep't Commerce June 30, 2017) (initiation of countervailing duty investigation). The period of investigation was January 1, 2016, through December 31, 2016. *Id.* at 29,837.

  Commerce selected COFCO, Niran, and Sunshine as mandatory respondents in the investigation and issued them questionnaires. Selection of Respondents for the Countervailing Duty Investigation on Citric Acid and Certain Citrate Salts from Thailand (July 21, 2017) at 1, CR 11, PR 38, CJA Tab 3, PJA Tab 3; I&D Mem. at 2-3. Commerce also issued a questionnaire to the Royal Thai Government ("the RTG"). I&D Mem. at 2. Respondents reported receiving zero benefit for duty-exemptions applied to the machinery because, absent IPA Section 28 eligibility, the machinery would have been eligible for duty-free treatment pursuant to the ASEAN-China FTA. *See* Royal Thai Gov't, CVD Questionnaire Resp. (Sept. 8, 2017) ("RTG QR") at 10, CR 55, PR 90, CJA Tab 7, PJA Tab 7; Sunshine Biotech Int'l Co., Ltd. CVD Questionnaire Resp. (Sept. 8, 2017) ("Sunshine QR") at 9, CR 15, PR 81, CJA Tab 4, PJA Tab 4; Initial Questionnaire Resp. (Sept. 8, 2017) ("COFCO QR") at 9, CR 44, PR 88, CJA Tab 5, PJA Tab 5; Initial Questionnaire Resp. (Sept. 8, 2017) ("Niran QR") at 10, CR 49, PR 89, CJA Tab 6, PJA Tab 6.

  The ASEAN-China FTA is a free trade agreement among the ten nations of the Association of Southeast Asian Nations and China that establishes a free trade area between its members. *See* Pet'rs' Rebuttal Factual Information Submission Regarding the 9/8/17 Initial Questionnaire Resps. (Sept. 22, 2017) ("Archer Daniels' Rebuttal Submission") Ex. 1 at 275, CR 102, PR 131, CJA Tab 8, PJA Tab 8 (listing the ASEAN-China FTA member states). This multilateral trade agreement, among other things, exempts equipment and machinery imported into Thailand from China from ordinary Thai import duties. I&D Memo. at 18; *see also* RTG QR at 10. The ASEAN-China FTA

contains rules of origin that prescribe varying requirements depending on the type of good.  *See* Archer Daniels' Rebuttal Submission, Ex. 1 at 261-272.  Thai companies may claim ASEAN-China FTA treatment by producing a certificate of origin issued pursuant to the ASEAN-China FTA, which demonstrates that the goods originated in a member country (i.e., China).  *See id.*, Ex. 1 at 265, 267-69.  However, the issuance of a certificate of origin does not necessarily confer ASEAN-China FTA preferential tariff treatment on those imports, which remain subject to verification procedures implemented by the importing member.  *See id.*, Ex. 1 at 270-272 (ASEAN-China FTA Rules 16, 19 and 21).

On November 3, 2017, Commerce preliminarily determined that certain Thai producers of citric acid were not receiving countervailable subsidies.  *See Citric Acid and Certain Citrate Salts From Thailand*, 82 Fed. Reg. 51,216 (Dep't of Commerce Nov. 3, 2017) (prelim. negative countervailing duty determination, prelim. negative critical circumstances determination and alignment of final determination with final antidumping duty determination); Decision Mem. for the Prelim. Negative Countervailing Duty Determination, Prelim. Negative Critical Circumstances Determination and Alignment of Final Determination with Final Antidumping Duty Determination (Oct. 30, 2017) ("Prelim. Mem.") at 1, PR 172, CJA Tab 10, PJA Tab 10.  While Commerce found that IPA Section 28's duty exemptions, as applied to Respondents' imported Chinese machinery, "constitute[d] a financial contribution in the form of revenue foregone," Commerce further found that "such duty-free imports [did] not confer a benefit" because the duty rates on the machinery "would have been zero" absent Respondents' participation in the

IPA Section 28 program.  Prelim. Mem. at 11.  Commerce based its finding on evidence indicating that the machinery would have alternatively qualified for duty-free treatment pursuant to the ASEAN-China FTA.  *Id.*  Although Commerce countervailed other IPA Section 28 duty-exemptions conferred upon Respondents' non-ASEAN-China FTA eligible machinery and equipment, Respondents' preliminary subsidy rates were *de minimis*.  *See id.* at 11, 13.

In November and December of 2017, Commerce conducted verification of Respondents' questionnaire responses.  *See* Verification of the Questionnaire Resps. of Sunshine Biotech Int'l Co., Ltd. (Jan. 19. 2018) at 1, CR 202, PR 228, CJA Tab 17, PJA Tab 17 ("Sunshine Verification Report"); Verification of the Questionnaire Resps. Of Niran (Thailand) Co., Ltd. (Jan. 18. 2018) at 1, CR 201, PR 227, CJA Tab 16, PJA Tab 16 ("Niran Verification Report"); Verification of the Questionnaire Resps. of COFCO Biochemical (Thailand) Co., Ltd. (Jan. 18. 2018) at 1, CR 200, PR 226, CJA Tab 15, PJA Tab 15 ("COFCO Verification Report").  Commerce found no evidence during verification to undermine its preliminary determination to use the ASEAN-China FTA tariff rate as the benchmark for determining the benefit conferred by the IPA Section 28's duty-free treatment of Respondents' machinery imported from China.  *See* I&D Mem. at 18 & n.89; Sunshine Verification Report at 6; Niran Verification Report at 7-8; COFCO Verification Report at 7-8.

On June 5, 2018, Commerce published its final determination.  *Final Determination*, 83 Fed. Reg. at 26,004.  Commerce's determination remained

unchanged with respect to the agency's use of the ASEAN-China FTA as the benchmark tariff rate.  *See* I&D Mem. at 18.  Commerce explained:

> [Respondents] have demonstrated, by means of import documentation verified by Commerce, that the imports in question were, in fact, Chinese origin and that, accordingly, the duty payable on the machinery and equipment in question would have been zero absent eligibility under Section 28 IPA program.  Thus, based on the record, as verified, we find that had [Respondents] entered the machinery and equipment in question under the ASEAN-China FTA and submitted the requisite forms to demonstrate Chinese origin under that arrangement instead of under the Section 28 IPA program, the duty rates applied would have been zero. Accordingly, the amount of duty paid pursuant to the Section 28 IPA program and the amount of duty [R]espondents would have paid on the Chinese-origin machinery and equipment absent the Section 28 IPA program are the same.  Thus, there is no countervailable benefit for this program for the imports of Chinese-origin and machinery.

*Id.* (footnotes omitted); *see also id.* at 18 n.89 (discussing verification).

Commerce rejected Archer Daniels' argument that Respondents would not have qualified for preferential tariff treatment pursuant to the ASEAN-China FTA "because they failed to submit an application under that program," concluding that the argument lacked legal authority.  *Id.* at 18.  Commerce reasoned that submitting an application would have required Respondents "to enter the same Chinese-origin goods under both the ASEAN-China FTA and the Section 28 IPA program for Commerce to determine whether a benefit existed under the program," and there was "no support for [that] approach in [Commerce's] regulations or practice."  *Id*.  Because Respondents continued to receive only nominal benefits for their respective non-ASEAN China FTA eligible imports, Commerce calculated zero or *de minimis* final countervailable subsidy rates for each respondent.  *Final Determination*, 83 Fed. Reg. at 26,006; I&D Mem. at

12.[3]  Accordingly, Commerce issued a negative final determination and terminated the investigation.  *See Final Determination*, 83 Fed. Reg. at 26,005-06.  On July 5, 2018, Archer Daniels timely commenced this action.  *See* Summons, ECF No. 1.  Plaintiff moved for oral argument and the court, after reviewing the Parties briefs filed pursuant to USCIT Rule 56.2, denied the request for oral argument as unnecessary.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(ii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(ii) (2012),[4] and 28 U.S.C. § 1581(c).[5]  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

---

[3] COFCO and Niran received final countervailable subsidy rates of zero percent, and Sunshine received a *de minimis* final countervailable subsidy rate of 0.21 percent.  *Final Determination*, 83 Fed. Reg. at 26,006; I&D Mem. at 12.

[4] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition, and all references to the United States Code are to the 2012 edition, unless otherwise stated.

[5] To establish standing under Article III of the U.S. Constitution, a plaintiff must show, *inter alia*, that its injury "is likely to be redressed by a favorable decision."  *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  Archer Daniels' complaint minimally addresses redressability.  While Archer Daniels' requests a "remand . . . for reconsideration consistent with the [c]ourt's opinion," Compl. ¶ 18, ECF No. 11, in its briefs, Archer Daniels avers that Commerce's use of a benchmark other than the ASEAN-China FTA would result in an above-*de minimis* subsidy rate and the issuance of a CVD order.  *See* Pls.' Br. at 10; Confidential Pls.' Reply Br. ("Pls.' Reply"), at 3-4, ECF No. 26.  In the future, it would be more appropriate to include such jurisdictional allegations in the complaint.

## DISCUSSION

### I. Parties' Contentions

Archer Daniels argues that "the record does not support Commerce's claim that the reported entries would have alternatively qualified for the zero-rate tariff under the ASEAN-China FTA at the time of entry." Pls.' Br. at 19 (internal quotation marks omitted). Pointing to the procedural requirements underlying the issuance of the certificate of origin pursuant to the ASEAN-China FTA, Archer Daniels argues that there "is no evidence on the record indicating that any of Respondents' imports complied with these requirements." *Id*. at 14. Without this evidence, Archer Daniels contends, Commerce could not reasonably determine that the machinery would have been eligible for preferential ASEAN-China FTA treatment. *Id*. at 14; *see also id*. at 23-24.

The Government contends that substantial record evidence—including submissions by all Respondents that "provided a detailed, itemized listing of all equipment originating from China along with the duty rates they would have received on the items even absent the IPA Section 28 Program" and statements from the RTG and Respondents that the machinery was of Chinese origin—supports Commerce's determination. *See* Def.'s Resp. at 7. The Government also contends that evidence adduced at verification further supports the agency's determination. *Id*. at 11-12 (explaining that Commerce "spot-checked the information at verification, examined the pre-selected observations and additional observations randomly selected on site, and confirmed its determinations"). According to the Government, Archer Daniels has failed "to identify a single document that suggests that the country of origin might differ from

what the weight of record documents show," i.e., China.  *Id*. at 8.  Additionally, the Government contends, Archer Daniels' "position makes no sense" because it infers that "[R]espondents (for no practical reason) should have taken the added step of meeting every procedural element for origination outlined in the ASEAN-China FTA even though they agree that respondents had no obligation or reason to specifically apply for the program."  *Id*. at 10.[6]

## II.   Commerce's Determination is Sustained

The parties dispute whether it was reasonable for Commerce to select the ASEAN-China FTA duty-free rate as the benchmark against which to measure whether Respondents received a countervailable benefit for imports of machinery through the IPA Section 28 program.  Archer Daniels argues that the ASEAN-China FTA is an inappropriate benchmark because the record does not indicate that Respondents complied with—or could have complied with—the trade agreement's requirements.  *See* Pls.' Br. at 2, 13-17.  Archer Daniels' arguments lack merit.

As Commerce explained, there is no support in its regulations or practice for requiring evidence of parallel compliance with ASEAN-China FTA procedural requirements as part of its identification of a suitable benchmark, I&D Mem. at 18, and

---

[6] The Government cites to Commerce's determination in a separate proceeding to support this assertion.  Def.'s Resp. at 10 (citing, *inter alia*, Issues and Decision Mem. for the Final Results in the Countervailing Duty Admin. Review of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014 ("Pneumatic Tires Mem.") at 20); *see also* Letter from Patrick J. Togni, King & Spalding LLP, to the Court (July 26, 2019), ECF No. 38 (copy of Pneumatic Tires Mem.).  That reference is not persuasive because it merely contains conclusions concerning the uncontested applicability of the ASEAN-China FTA.  *See* Pneumatic Tires Mem. at 20.

Archer Daniels does not point to any.[7] The record reflects that Commerce reviewed import documentation in order to assess the applicability of the ASEAN-China FTA. Commerce is afforded latitude in determining whether the requirements of countervailability have been met. *Cf. Royal Thai Gov't v. United States*, 436 F.3d 1330, 1336 (Fed. Cir. 2006) (Commerce reasonably declined to engage in a transaction-by-transaction review of an allegedly countervailable loan program because the agency reasonably determined that the collection of the "necessary information to engage in the extensive calculations contemplated by [the petitioner] was impracticable"). While Archer Daniels is correct that the country of export may not be determinative of the country of origin, Pls.' Br. at 23, Archer Daniels has not identified any record evidence demonstrating that Commerce's assumption, based on its review of record evidence and additional documentation at verification, was unreasonable. Commerce's finding is supported by substantial evidence of the machinery's Chinese origin and Archer Daniels has failed to identify evidence that fairly detracts from that conclusion. *See* I&D Mem. at 18 & n.89 (citations omitted).[8]

---

[7] For this reason, Archer Daniels' argument that Commerce failed to consider the degree to which each piece of machinery imported by Respondents individually complied with the ASEAN-China FTA requirements is unpersuasive. *See* Pls.' Br. at 16; Pls.' Reply at 9 (contending that duty-free treatment pursuant to the ASEAN-China FTA is not automatic, and that every article must qualify in its own right).

[8] Archer Daniels avers that Commerce's determination is undermined by Niran's verification outline, which stated that, "[f]or purchases of machinery that Niran reported duty free under non-[Thai Board of Investment ("BOI")] related exemptions (such as the ASEAN-China Agreement) or on imports of machinery that Niran reported it did not receive an exemption, be prepared to demonstrate the accuracy of this information with supporting documentation." Pls.' Reply at 13-14 (quoting Niran Verification Report at 8) (asserting that the record lacks the requested evidence). However, at issue here are

Court No. 18-00160 　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 13

The case law upon which Archer Daniels relies is unpersuasive.  Archer Daniels argues that several decisions of this court confirm that origin statements on customs documentation does not confer country of origin for purposes of free trade agreements, including the ASEAN-China FTA.  *See* Pl's Br. at 17-20.  Archer Daniels cites three cases in support of this proposition, each of which is inapposite.  *See id.* (citing *Polly U.S.A., Inc. v. United States*, 33 CIT 1051, 637 F. Supp. 2d 1226 (2009); *United States v. Univar USA Inc.*, 42 CIT ___, 355 F. Supp. 3d 1225 (2018); *Int'l Fid. Ins. Co. v. United States*, 41 CIT ___, ___, 227 F. Supp. 3d 1353, 1354 (2017)).

Two of the three cases concern the domestic enforcement of free trade agreements codified by Congress implicating statutory origin verification obligations. *See Polly*, 33 CIT at 1053-54, 637 F. Supp. 2d at 1229; *Int'l Fid.*, 227 F. Supp. 3d at 1371-72.  *Polly* and *International Fidelity* concern the domestic statutory and regulatory requirements necessary to establish the country of origin when foreign merchandise enters the United States and the importer claims preferential duty treatment pursuant to the North American Free Trade Agreement or the African Growth and Opportunity Act. *See Polly*, 33 CIT at 1053-54, 637 F. Supp. 2d at 1229; *Int'l Fid.*, 227 F. Supp. 3d at 1371-72.  Here, there are no statutory or regulatory mandates that require Commerce to adopt a specific methodology when evaluating a foreign free trade agreement for

---

Respondents' machinery imports reported duty free pursuant to BOI-related (i.e., IPA Section 28) exemptions, not *non-BOI* related exemptions.  While Respondents reported ASEAN-China FTA *eligibility*, *see* Sunshine QR at 9; COFCO QR at 9; Niran QR at 10, Respondents did not report duty-free *treatment* under the ASEAN-China FTA.  Thus, Archer Daniels' argument is unpersuasive.

purposes of identifying a benchmark tariff rate.  *Univar*, a case involving the collection of allegedly unpaid duties and penalties pursuant to 19 U.S.C. § 1592, is further afield.  There, the court confined its discussion of certificates of origin to its analysis of corresponding evidentiary disputes in the context of the underlying transshipment allegation.  *See Univar*, 355 F. Supp. 3d at 1262-63.

      Archer Daniels also relies on *Royal Thai V* to support the proposition that Commerce does not engage in speculation when selecting a benchmark.  Pls.' Br. at 20-21 (citing *Royal Thai V*, 32 CIT at 97, 534 F. Supp. 2d at 1373).  *Royal Thai V* affirmed Commerce's decision declining to find "countervailability because it lacked information regarding applicable alternative tariff rates."  *Royal Thai V*, 32 CIT at 101-02, 534 F. Supp. 2d at 1378-79.  Here, however, Commerce relied on record evidence—not speculation—to support its selection of the ASEAN-China FTA.  *See* I&D Mem. at 18-19 (reviewing unrebutted record evidence concerning Chinese origin and determining that the machinery would have otherwise qualified for duty-free treatment pursuant to the ASEAN-China FTA).

      Lastly, Archer Daniels relies on *Government of Sri Lanka v. United States*, 42 CIT ___, 308 F. Supp. 3d 1373 (2018), to support the proposition that Respondents' duty-exemptions are countervailable because Commerce failed to adduce evidence that the ASEAN-China FTA "nullified" any alleged benefit Respondents received from the IPA Section 28 Program.  Pls.' Reply at 14-15.  Archer Daniels misapplies *Government of Sri Lanka*, which concerns the partial nullification of a countervailable benefit by the imposition of a one-time "Super Gains Tax," and does not otherwise address

Court No. 18-00160	Page 15

Commerce's selection of Sri Lanka's standard corporate income tax rate as the benchmark income tax rate.  *See Gov't of Sri Lanka*, 308 F. Supp. 3d at 1377-79.[9]

      In sum, Archer Daniels would have Commerce base a countervailing duty order on nothing more than Respondents' failure to comply with paperwork requirements necessary to qualify for a duty-free treatment program that would have permitted them to import the machinery at the same duty-free rate as the program in question.  Archer Daniels has failed to identify any legal authority or record evidence suggesting that Commerce's refusal was unreasonable.  Commerce's decision to use the ASEAN-China FTA tariff rate as the benchmark tariff rate is supported by substantial evidence and is otherwise in accordance with law.

---

[9] Archer Daniels argues that Commerce's benefit calculation is "inconsistent with the *CVD Preamble*" and the agency's finding that IPA Section 28 duty exemptions are contingent on export performance.  Pls.' Br. at 22 (citing *Countervailing Duties*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) (final rule)); *see also* I&D Mem. at 11 (concluding that IPA Section 28 duty exemptions were "specific" when conditioned on export performance).  Archer Daniels suggests that Commerce found some portion of Respondents' benefits "related solely to 'non-export-related criteria'" and did not include the program in its benefit calculation for that reason.  Pls.' Br. at 22-23.  Archer Daniels offers no support for this assertion.  The export contingency of the program is relevant to specificity rather than benefit. I&D Mem. at 11.  Commerce excluded IPA Section 28-related duty exemptions respecting Respondents' machinery from its benefit calculations because the alternative tariff rate pursuant to the ASEAN-China FTA would have been zero.  I&D Mem. at 18-19.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's *Final Determination*. Archer Daniels' motion for judgment on the agency record is denied. Judgment will be entered accordingly.

/s/   Mark A. Barnett
Mark A. Barnett, Judge

Dated: August 2, 2019
New York, New York